

**SO ORDERED.**

**SIGNED this 2 day of October, 2012.**

_____
**James D. Walker, Jr.
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 11-53874-JDW |
| STEPHEN S. PUTNAL, | ) | |
| | ) | |
| DEBTOR. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

COUNSEL

For Debtor:   David L. Bury, Jr.
              Ward Stone, Jr.
              577 Mulberry Street, Suite 800
              Macon, Georgia 31201

For SunTrust Bank:   Cater C. Thompson
                     Timothy K. Adams
                     Post Office Box 6437
                     Macon, Georgia 31208-6437

**MEMORANDUM OPINION**

This matter comes before the Court on Debtor's motion to use cash collateral. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(M). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

On December 5, 2011, Debtor Stephen S. Putnal filed a Chapter 11 petition. Debtor owns and manages income-producing properties, including a nuclear pharmacy in Chattanooga, Tennessee. SunTrust Bank holds a claim in this case secured by multiple real properties, including the Chattanooga property. After crediting Debtor for the value of surrendered collateral, the principal balance of SunTrust's debt is approximately $1,351,035. The parties agree that as of July 2012, the value of the Chattanooga property was $470,000. After taking into account the value of the Chattanooga property and the value of other collateral Debtor intends to retain, the parties agree SunTrust will have an unsecured claim of more than $500,000.

SunTrust's deed of trust on the Chattanooga property provides SunTrust with a security interest in the real property and in

> any and all leases and contracts affecting the Premises both presently existing and hereafter arising, and all rents, income, or profits, which are now due or may hereafter become due ..., all of which are hereby assigned to [SunTrust] as further security for the repayment of indebtedness[.]
> ...
> [Debtor] hereby assigns to [SunTrust] all rents, revenues, incomes and profits of the Premises, including those now or hereafter due, subject only to the condition that [SunTrust] shall not collect such rents, revenues, incomes and profits so long as [Debtor] is not in

2

> default under this Deed of Trust. ... [SunTrust's] right to receive such rents shall not be affected by the institution of any bankruptcy, reorganization or insolvency proceedings by or against [Debtor].

(SunTrust Bank's Objection to Debtor's Use of Cash Collateral, exhibit E ¶¶ 1, 3 at docket #70.)

Debtor currently leases the Chattanooga property to Triad Isotopes, Inc. for $6,966.10 per month. The lease is a triple-net lease, meaning Triad is responsible for paying the insurance, ad valorem taxes, and maintenance costs separately from the monthly lease payments. Nevertheless, Debtor testified that he occasionally incurs unreimbursed expenses related to the pharmacy. For example, he has traveled to the Chattanooga pharmacy twice since the bankruptcy case was filed–once to deal with a leak and once to deal with loose pipes. Triad does not compensate Debtor for his time or travel costs. Debtor submitted a budget into evidence (Debtor's exhibit 1) showing projected business expenses (excluding property tax) of $12,474.46 per month through December 2012. Debtor testified that approximately 20% of that amount represents unreimbursed expenses attributed to four pharmacies, including the Chattanooga pharmacy.[1] The remainder of the expenses are attributed to his management of 8,700 acres of timber land.[2]

Debtor testified the lease on the Chattanooga property will terminate on December 31, 2012. However, Debtor is currently negotiating with Triad to extend the lease for an additional

---

[1] Debtor also incurs negligible expenses from a fifth pharmacy in Athens, Georgia, that will be sold. Because the Athens pharmacy is primarily managed by Debtor's business partner, the sale of the pharmacy will not have a measurable impact on Debtor's unreimbursed business expenses.

[2] During direct examination, Debtor stated that the category of "business expenses" in the budget covered expenses for managing the pharmacies and timber land. During cross examination, he stated the "business expenses" included expenses for managing the pharmacies, timber land, and farms.

3

two years at a higher monthly rent.

Debtor filed a motion seeking authorization to use SunTrust's cash collateral–the rents from the Chattanooga property. Since the filing of that motion, Debtor has placed into escrow all rents received from the property; the total rents held in escrow were $55,728.80 on or about September 5, 2012. SunTrust objected to Debtor's motion. The Court held a hearing on the motion on August 22, 2012. During the hearing, counsel for Debtor proposed to pay SunTrust $3,600 per month as adequate protection, allowing Debtor to retain approximately $3,000 of the monthly rents to pay costs of administration in the Chapter 11 case and to pay Debtor's expenses in general. These costs include $5,000 Debtor incurred to obtain an appraisal and costs incurred during lease negotiations with Triad. SunTrust argued Debtor is not entitled to retain any of the rents.

As mentioned above, the parties agree the Chattanooga property was worth $470,000 as of July 2012. In addition, Debtor testified that he believes the property was worth $470,000 on the petition date and that it has not declined in value since that time. Debtor contends that once a new lease is negotiated at a higher rental rate, the value of the property will increase. During the hearing, counsel for SunTrust argued that the property value has declined since the petition date because the future stream of income has decreased every month and will terminate in December 2012 unless a new lease is negotiated. The Court has no other evidence relating to the current or future value of the property.[3]

---

[3] After the hearing, Debtor filed an appraisal of the Chattanooga property. The appraisal was not introduced into evidence during the August 22, 2012, hearing, and SunTrust was not given an opportunity to cross-examine the appraiser. See LBR 3012-1(b). Therefore the appraisal has no evidentiary value for purposes of Debtor's motion to use cash collateral and will not be considered by the Court.

After considering the evidence and legal arguments, the Court will grant Debtor's motion and authorize limited use of the rents. In summary, Debtor may use the rents to pay the $5,000 he incurred to obtain an appraisal of the Chattanooga property; Debtor may use the rents to pay any expenses he incurs in negotiating a new lease on the property; and Debtor may retain up to $623.72 from each rent payment to pay unreimbursed expenses of maintaining the property, provided that SunTrust may object to any specific expenditures.

### Conclusions of Law

At issue in this case is whether and to what extent Debtor may use post-petition rents generated by the Chattanooga pharmacy.[4] The parties agree SunTrust holds an 11 U.S.C. § 552(b)(2)[5] security interest in the post-petition rents, and therefore the rents are SunTrust's cash collateral.[6] Under 11 U.S.C. § 363(c)(2), Debtor may not use SunTrust's cash collateral without either SunTrust's consent or authorization by the Court. In this case, SunTrust does not consent to use of its cash collateral. Therefore, Debtor must obtain Court authorization to use the rents.

Under 11 U.S.C. § 363(e), if the Court authorizes use of the cash collateral, it "shall

---

[4] Also in dispute is the appropriate allocation of any rents received by SunTrust–specifically, whether SunTrust must apply the rents to reduce the secured portion of its claim. However, the parties agree that allocation of payments is a confirmation issue that need not be decided at this time.

[5] 11 U.S.C. § 552(b)(2) provides in part as follows: "[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property ... then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."

[6] Cash collateral is defined to include "rents ... subject to a security interest as provided in section 552(b) of this title[.]" 11 U.S.C. § 363(a).

5

prohibit or condition such use ... as is necessary to provide adequate protection" of the secured creditor's interest in the property. Id. § 363(e). Under 11 U.S.C. § 361, adequate protection may consist of cash payments or a replacement lien to offset any diminution in the value of the collateral, or some other relief that provides the creditor with the "indubitable equivalent" of its interest in the property. The burden of proof is on Debtor to demonstrate SunTrust is adequately protected for purposes of using its cash collateral. Id. § 363(p)(1).

SunTrust argues that its security interest in the rents is separate from its security interest in the real property, and therefore it is entitled to separate adequate protection for the use of the rents. Debtor's argument is three-fold: (1) Debtor is at least entitled to use the rents to the extent necessary to cover unreimbursed maintenance expenses at the Chattanooga property; (2) SunTrust does not have a separate security interest in rents; rather it has a single, unified interest in the land and rents that is adequately protected so long as the value of the real property is not declining; and (3) if SunTrust has a separate interest in rents, that interest is protected so long as SunTrust receives compensation for expected deterioration and obsolescence of the Chattanooga property.

To support his argument, Debtor cited two cases: In re Mullen, 172 B.R. 473 (Bankr. D. Mass. 1994) and In re Wrecclesham Grange, Inc., 221 B.R. 978 (Bankr. M.D. Fla. 1997). In Mullen, the creditor held a security interest in the debtor's real property and rents from that property. The creditor, which was undersecured, requested turnover of all the rents net of expenses. The court framed the issue as whether the creditor's "adequate protection rights concerning rents should be considered separately or as part of the adequate protection of its security interest in the Debtor's entire property interests, including the stream of future rents." Id.

6

at 474.

The creditor contended it had "adequate protection rights in the rents which are independent of its right to adequate protection of its security interest in the debtor's entire interest in the property, including the debtor's right to collect rents." Id. at 475. The court disagreed. It denied the creditor's request for turnover of rents based on two alternate theories. Id. at 481.

First, the court set forth a replacement-lien theory of adequate protection of the rents. It reasoned that the value of the property's income stream was not declining as rents were consumed because "[t]he lien on each month's rents replaces the lien on the prior month's rents, so there is a replacement lien of equal value." Id. at 476. The court distinguished rents from other types of cash collateral, such as certificates of deposit, that are not replaced after use by the debtor. Id. at 478. The court further concluded that rents cannot be treated as a separate property interest subject to separate adequate protection, because the value of the underlying property usually incorporates the value of future income streams. Id.

Next, the court articulated an equities theory for allowing the debtor to use rents. Pursuant to 11 U.S.C. § 552(b)(2) a creditor whose security agreement covers rents automatically receives a security interest in post-petition rents "except to any extent that the court, after notice and a hearing based on the equities of the case, orders otherwise." According to the legislative history, Congress intended the exception to apply when the rents or other proceeds of collateral were acquired at the expense of unsecured creditors, such as during the conversion of raw materials into inventory or the conversion of inventory into accounts. Id. at 479 (citing H.R. Rep. No. 595, 95 Congr., 1st Sess. at 377 (1977)). The court concluded the equities exception is not limited to the example provided in the legislative history because "[t]he standard for application of the

7

exception–'the equities of the case'–gives the court the broadest possible charter." Id. at 479. The court found it would be inequitable for the creditor to collect the net rents, because it would "substantially improve" the creditor's position. Id. As rents were collected the creditor's "debt would decline, yet its security value would remain constant."[7] Id.

     Wrecclesham Grange also involved the adequate protection of an undersecured creditor's interest in rents. However, the issue arose in the context of the creditor's motion for relief from the automatic stay due to lack of adequate protection rather than the debtor's request to use cash collateral.[8] 221 B.R. at 979-80. The court noted that a creditor is adequately protected so long as the value of its collateral is not declining. Id. at 981. It then adopted the replacement-lien theory for determining whether the creditor's interest in the rents is adequately protected. Id. "[A]s long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral. ... The rationale is that the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced." Id. (citing In re Megan-Racine Assoc., 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996); Mullen, 172 B.R. at 477-78). The court deferred a determination on whether the creditor was adequately protected until after a evidentiary hearing.

     The replacement-lien theory embraced by both Mullen and Wrecclesham Grange has not

---

[7] The Court finds this particular equities argument unpersuasive. According to the legislative history, the purpose of adequate protection "is to insure that the secured creditor receives in value essentially what he bargained for." S. Rept. No. 95-989, 95th Cong., 2d Sess. at 53 (1978). A lender that takes an interest in both real property and rents bargains for the right to possession of both in the event of a default under nonbankruptcy law. Preserving the equivalent of those rights in bankruptcy cannot be said to be inequitable.

[8] Under 11 U.S.C. § 362(d)(1), the court may grant stay relief to a secured creditor who is not adequately protected.

8

gained broad acceptance. Instead, it has been rejected by more recent cases as invalid on the ground that the debtor cannot give the creditor a replacement lien in future rents because the creditor's security interest already extends to those rents. As explained by the court in In re Smithville Crossing, LLC, No. 11-02573-8-JRL, 2011 WL 5909527 (Bankr. E.D.N.C. Sept. 28, 2011), "Virtually every case addressing this issue has held that the proffer of a replacement lien on post-petition rents is illusory by virtue of § 552(b) of the Bankruptcy Code." Id. at *10 (collecting cases).

One of the earliest cases to reject the replacement-lien theory is Travelers Insurance Company v. River Oaks Limited Partnership (In re River Oaks Limited Partnership), 166 B.R. 94 (E.D. Mich. 1994). The debtor owned an apartment complex subject to the lender's security interest in the building and the rents. Id. at 95. The bankruptcy court entered a cash collateral order allowing the debtor to use rents for the costs and expenses of maintaining the apartment project. When the debtor proposed to use the rents to pay expert witness fees incurred during the bankruptcy case, the lender objected based on lack of adequate protection. Id. at 96. The bankruptcy court ruled in favor of the debtor, citing the regeneration of the rent rolls and continued maintenance of the property as adequate protection. Id. at 96-97. The lender appealed. Id. at 97.

The district court found that the lender held "two distinct security interests"–one in the building and one in the rents, and each interest was entitled to separate adequate protection. Id. at 97, 99. The court then turned to the sufficiency of adequate protection in rents and found it lacking. First, properly maintaining the building does not by itself provide adequate protection for the security interest in the rents because the debtor would have to maintain the property even

9

if the lender did not have an interest in the rents. Id. at 99. Second, regeneration of the rents does not provide adequate protection because the secured creditor already "has a security interest in the full amount of the future rents." Id. Thus, "a diversion of any portion of the rents to a party other than the secured party is clearly a diminution of the secured party's interest in the assignment of rents portion of the security." Id.

The court concluded that use of rents for anything other than expenses directly related to the "operation, maintenance or preservation" of the property is allowable only if "(1) the secured party consents to the expenses, (2) the expenses are reasonable and necessary to preserving or disposing of such property and are incurred primarily for the benefit of the secured creditor, or (3) the secured party 'caused' the expenditure of such funds." Id. at 100 (citations omitted). The court remanded the case to the bankruptcy court for a determination of whether the lender "caused" the debtor to incur the expert witness fees. Id.

Among the cases that have relied on the River Oaks reasoning is the only circuit court case to address the issue: Searns Building v. WHBCF Real Estate (In re Stearns Building), 165 F.3d 28, 1998 WL 661071 (6th Cir. 1998) (unpublished table opinion). The bankruptcy court issued a cash collateral order denying the debtor's request to use rents to pay administrative expenses. The debtor appealed the ruling and requested a stay pending appeal. The district court denied the stay request. The debtor then appealed the denial of the stay request to the circuit court. Id. at *2-3. In reviewing the denial of the stay, the Sixth Circuit considered the debtor's likelihood of success in appealing the cash collateral order. Id. at *3. The court first determined the rents were the lender's cash collateral and, thus, could not be used by the debtor without adequate protection. Id. at *4. The court found the debtor could not offer the lender adequate

10

protection because the debtor had no unencumbered property in which it could offer a replacement lien. Id. The court cited River Oaks for the proposition that a creditor with a security interest in real property and its rents holds "*two distinct security interests*" and that each interest "must be adequately protected." Id. at *5 (citing River Oaks, 166 B.R. at 97, 99) (emphasis in original). Furthermore, newly generated rents and maintenance of the real property do not provide adequate protection for the rents; thus, by diverting the rents away from the secured lender, the debtor diminished the lender's interest in those rents. Id. After considering other factors relevant to issuing a stay pending appeal, the court affirmed the denial of the stay request. Id. at *7.

More recently, in In re Buttermilk Towne Center, LLC, 442 B.R. 558 (B.A.P. 6th Cir. 2010), the debtor sought to use the undersecured lender's cash collateral (rents) to pay professional fees. The lender objected, arguing it was not adequately protected. The bankruptcy court ruled for the debtor, finding the lender was adequately protected by a replacement lien in the rents. Id. at 561, n.1. The appellate panel disagreed. The court followed Stearns Building and River Oaks to conclude that a replacement lien in future rents offers no adequate protection because the lender's lien already covers those rents. Id. at 566-67. Therefore, it reversed the cash collateral order. Id. at 567. See also In re May, 169 B.R. 462, 472 (Bankr. S.D. Ga. 1994) (refusing to allow use of rents subject to the lender's security interest for "any purpose other than direct costs associated with the underlying real estate (debt services, taxes, utilities, maintenance, and the like)" because "such a use 'results in a decrease in the value' of [the creditor's] interest in the rents."); In re Griswold Building, LLC, 420 B.R. 666, 699-701, 705-06 (Bankr. E.D. Mich. 2009) (relying on River Oaks to conclude an undersecured lender had separate interests in real

property and in rents; a chapter 11 plan that paid none of those rents to the lender, but instead used the rents to pay professional fees, unsecured claims, and operating cash flow shortages was not fair and equitable); In re Las Torres Development, LLC, 413 B.R. 687, 696-97 (Bankr. S.D. Texas 2009) (finding it "disingenuous to argue that the Debtors can grant replacement liens to the Lender on post-petition rents ... because the Lender already has a lien on the Rents," but finding that the creditor's substantial equity cushion provided adequate protection for use of cash collateral).

The Court agrees with River Oaks and its progeny. Section 552(b) provides SunTrust with a security interest in post-petition rents that is separate from its interest in the real property. Because the rents are separate collateral, any use of the rents results in a dollar-for-dollar reduction in the value of that collateral. Paying SunTrust a portion of the rents, as Debtor has proposed, does not protect SunTrust against that loss in value.[9] However, under River Oaks, no adequate protection is necessary to the extent the rents are used to protect the Chattanooga property or otherwise benefit SunTrust's interest in the property.

Debtor has requested use of post-petition rents to pay the $5,000 he incurred to appraise the Chattanooga property. Debtor asserts the appraisal was conducted to determine the most beneficial disposition of the property in the bankruptcy case. Because that benefit accrues to SunTrust, the Court will authorize use of the post-petition rents to pay for the appraisal.

Debtor also has requested use of the post-petition rents to pay management costs and

---

[9] As discussed in footnote 4, allocation of any rent payments turned over to SunTrust may be the subject of dispute at a confirmation hearing. The relationship between the real estate and the future streams of income in the valuation of the Chattanooga property may be relevant to resolution of the allocation issue.

attorney fees necessary for negotiating an extension of the current lease on the Chattanooga proeprty. If successful, the costs of negotiation will benefit SunTrust by extending the life and the value of the future income stream, thereby protecting its interest in the rents. Therefore, the Court will authorize the use of post-petition rents for costs associated with negotiating a lease extension on the Chattanooga property. Debtor may submit evidence of those costs at a later date.

Finally, Debtor has requested use of cash collateral to pay overhead-type expenses on the Chattanooga property that are not reimbursed through the triple-net lease. Counsel for SunTrust conceded that the case law permits Debtor to use rents for unreimbursed direct expenses of the property. Debtor testified that he incurs such expenses occasionally, for example when he is required to travel to Chattanooga to oversee repairs. A budget provided by Debtor projects business expenses to be $12,474.46 per month for the remainder of 2012. Debtor testified that approximately 20% of those funds are used to cover expenses on four pharmacies. Twenty percent of $12,474.46 equals $2,494.89. Assuming that amount is divided equally among the four pharmacies, the Chattanooga pharmacy accounts for 25% of those costs, or $623.72 per month.[10] The Court will authorize Debtor to use up to $623.72 per month of cash collateral for unreimbursed costs of maintaining the pharmacy subject to objection by SunTrust as to specific expenditures.

---

[10] In Debtor's brief, his counsel argues that 100% of the business expenses should be attributed to the pharmacies because all other business expenses are covered by the category of "Farm and Other" expenses. The Court disagrees. The budget divides expenses into four categories: (1) Business; (2) Personal - Residence and Daily Living; (3) Personal - Farm and Other; and (4) Restructuring Expenses. Thus, the budget indicates that at least some of the farm expenses are personal expenses rather than business expenses. Furthermore, Debtor testified that the "business expenses" category of the budget includes expenses for the management of the pharmacies, the timber land, and the farm.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT